Entered: December 15th, 2023
Signed: December 15th, 2023



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Cleary Packaging, LLC, | * | Case No. 21-10765-MMH |
| | * | |
| Debtor. | * | Chapter 11 |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### <u>MEMORANDUM OPINION</u>

Chapter 11 of the U.S. Bankruptcy Code[1] is a reorganization chapter. It is intended to help distressed businesses manage their financial obligations while continuing their operations.[2] Congress has found utility in giving distressed businesses an opportunity for a fresh financial start, provided they comply with the Code. Given that a debtor's creditors often receive less than full recovery in a chapter 11 case, several of the Code's requirements speak to protecting the interests of, and maximizing value for, creditors. Value maximization does not necessarily trump the virtues of reorganization in chapter 11, but both goals must be carefully balanced and served.

The case before the Court involves a relatively productive business debtor that seeks relief primarily from one large prepetition obligation. Although the debtor has several prepetition

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code").
[2] Certain individuals also may qualify to be debtors under chapter 11 of the Code but the case pending before the Court involves only an entity debtor.

creditors, it is this one large prepetition obligation (a state court judgment) that forced the debtor into bankruptcy and weighs on its chapter 11 plan of reorganization. The state court judgment, moreover, stems from the formation and operation of the debtor's business by an individual who remains in charge of the debtor, and who also proposes to continue to own and operate the debtor postconfirmation. This fact pattern does not preclude the debtor's reorganization under chapter 11 but it does require the Court to closely scrutinize the terms of the plan and the value being offered to creditors.

Specifically, the key question in this case is whether the debtor's principal is contributing sufficient new value to the debtor's reorganization efforts to retain his 100% ownership interest in the debtor. This analysis is complicated by the fact that some of the proposed new value is not a fresh capital contribution; unsecured creditors are estimated to recover only about 27% of their claims under the plan; and the plan term is only 60 months. Although a 60-month plan term is common in certain kinds of bankruptcy cases, it is not the general standard in traditional entity chapter 11 cases and limits the value available for distribution to creditors in this case.

The Court notes that the new value exception to the absolute priority rule, which is at issue in this case, is an important doctrine that can help debtors utilize chapter 11's tools and facilitate successful reorganizations. It is not, however, a means for prepetition equity to shelter future value from creditors or otherwise extinguish creditors' claims without appropriate distributions.

The Court cannot condone the windfall to the debtor's prepetition equity proposed in this case. Had the debtor's plan offered a significant new value contribution or larger returns to creditors, perhaps the analysis would have been different. As it stands and as further explained below, the debtor has failed to meet its burden on confirmation.

The competing plan filed in this case likewise suffers from several deficiencies. Even if that plan had received support from creditors other than the plan proponent, the plan proponent did not meet its burden of proof. The record contains inadequate evidence that the competing plan proposes a workable scheme of reorganization or is otherwise feasible. The Court therefore declines to confirm either of the plans submitted for confirmation.

## I.     Pending Matters

The primary matters before the Court are (i) the Fourth Amended Chapter 11 Plan of Reorganization (the "Debtor's Plan"), filed by Cleary Packaging, LLC (the "Debtor"); (ii) the Second Restated Plan of Reorganization (the "Creditor's Plan" and, together with the Debtor's Plan, the "Competing Plans"), filed by Cantwell-Cleary Co., Inc. (the "Creditor"); and (iii) the Motion to Designate Vote of Cantwell-Cleary (the "Designation Motion"), filed by the Debtor. ECF 452, 515-5, 518, 542. The Debtor and the Creditor have filed a number of papers, including objections, relating to the Competing Plans and the Designation Motion.[3] The Court held an evidentiary hearing on the Competing Plans and the Designation Motion, among other pending matters, on October 26, 27, and 30, and November 1, 2023 (the "Confirmation Hearing").[4]

## II.     Relevant Background

The Debtor has operated in the packaging industry since 2018. The Debtor's founder and sole owner is Mr. Vincent Cleary (the "Principal"). The Creditor also operates in the packaging industry and is owned by members of the Principal's family. The Principal previously worked for the Creditor in a variety of positions. The Principal's departure from the Creditor's employ and his

---

[3] *See, e.g.*, ECF 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 574, 575, 577.
[4] The parties presented their evidentiary cases on October 26, 27, and 30, 2023, and offered closing arguments on November 1, 2023.

subsequent organization of the Debtor resulted in state court litigation. The Creditor secured a judgment against the Debtor and the Principal in the amount of $4,715,764.98.

On February 7, 2021, the Debtor filed a petition under chapter 11 of the Code and elected to proceed under subchapter V of chapter 11. The subchapter V case was consumed with litigation between the Debtor and the Creditor, and the Debtor did not confirm a plan of reorganization under the subchapter. Rather, the Debtor amended its voluntary petition to remove the subchapter V designation, and it is now proceeding with a traditional chapter 11 case. ECF 352. After removal of the designation, the Debtor sought to move forward with its proposed plan of reorganization, and the Creditor filed a competing plan. ECF 353, 354, 393, 394.

At a preliminary hearing on the disclosure statements accompanying prior versions of each party's plan of reorganization, the Creditor raised several issues concerning the Debtor's plan, including whether the plan violates the absolute priority rule and improperly classifies claims. The Creditor asserted that these issues rendered the Debtor's proposed plan unconfirmable. The Debtor disagreed with the Creditor's position and argued that, in any event, such issues must await the evidentiary hearing on plan confirmation. The Court issued a preliminary order addressing certain of these legal issues but reserved final determination until the confirmation hearing and the development of a full evidentiary record by both parties (the "Preliminary Order"). ECF 442.

### III.    Events Preceding the Confirmation Hearing

On August 21, 2023, the Court entered an Amended Order Setting Certain Deadlines, Disclosure Statement Hearing, and Confirmation Hearing, which set the Confirmation Hearing for October 26 and 27, 2023. ECF 466. The Court has emphasized throughout this case the need to keep the case on track and to avoid additional, unnecessary delay. Consequently, the initial and subsequent

scheduling orders set firm deadlines to encourage timely prosecution of the Competing Plans. *See, e.g.*, ECF 489, 495.

The Debtor and the Creditor brought multiple disputes to the Court in the months leading up to the Confirmation Hearing. First, the Debtor sought expedited consideration of two settlement agreements with creditors in this case. ECF 449, 479. The Creditor opposed both, and the Court continued consideration of those matters to the Confirmation Hearing. ECF 512. The parties also filed motions to compel discovery, and the Creditor objected to the Debtor's amended disclosure statement. The Court addressed these matters at a hearing on September 20, 2023, with a continued hearing on the discovery issues on October 5, 2023. The Court ultimately approved the parties' respective disclosure statements and proposed solicitation packages. ECF 519, 521. The Court also issued separate orders on the parties' disputes regarding discovery and expert witness issues. ECF 546, 558.

The voting and objection deadline on the Competing Plans was set as October 21, 2023. The Debtor and the Creditor each filed their respective tally of votes and witness and exhibit lists on or before the relevant deadlines. ECF 566, 567, 568, 569, 570, 572, 579. The Court allowed each party to present their evidence and legal arguments on the Competing Plans, the Designation Motion, and certain related motions at the Confirmation Hearing.[5]

### IV.    Overview of the Competing Plans

Both of the Competing Plans contemplate the reorganization of the Debtor and a percentage payment to unsecured creditors. The Debtor's Plan achieves this objective by proposing payments to unsecured creditors for a period of five years, with the actual amount of future payments to be

---

[5] *See supra* note 3. *See also, e.g.*, ECF 395, 420, 449, 477, 479, 496, 501, 505, 506, 510, 576, 577, 578.

determined by the Debtor's projected disposable income.[6] Under the Debtor's Plan, the Principal would retain his equity in the Debtor by contributing what the Debtor calls "new value" for that equity. Thus, the ownership and operations of the Debtor would be substantially identical both before and after confirmation.

The Creditor's Plan contemplates the Creditor buying the Debtor's equity for a fixed sum ($250,000.00) and then operating the business to fund additional payments to unsecured creditors under the plan (including payment on the Creditor's claim). The Creditor proposes to subordinate payment on its claim to the payment of other unsecured creditors under its plan. The Creditor's Plan is unclear concerning the management or operational structure of the proposed reorganized business. For example, the plan leaves open certain operational questions, including whether the reorganized business would remain a separate entity or be merged into the Creditor's business. The Creditor's Plan also would preserve and pursue avoidance actions against certain parties, which claims are abandoned under the Debtor's Plan. The Creditor's Plan proposes to pay a greater percentage recovery to unsecured creditors over a nine-year period.

The creditors in this case, other than the Creditor, strongly favor the Debtor's Plan. With respect to the Debtor's Plan, all creditors in Class 4 voted to accept the plan, and the Creditor (as the Class 5 claimant) voted to reject the Plan. ECF 566. With respect to the Creditor's Plan, the Creditor (as the Class 6 claimant) voted to accept the Plan, but all other creditors who voted on the plan (four creditors in Class 5, including the Principal) voted to reject the plan. ECF 572. At the

---

[6] At the Confirmation Hearing, the Debtor's counsel explained that the Debtor's Plan was based on "projected" disposable income but that the Debtor would be willing to guarantee any shortfall between that projected disposable income and a distribution of $1 million to creditors under the Debtor's Plan. Tr. 3, ECF 594, at pp. 115–117 ("What we would argue is that to the extent that the Court is not impressed enough with the certainty of those monies, that we are positioned to guarantee a minimum of one million over five years."). The Court need not reach this issue because, under either a projected or actual disposable income approach, the plan is not confirmable under section 1192(b) of the Code.

6

Confirmation Hearing, the parties offered evidence on the Debtor's Plan, the Creditor's Plan, the Creditor's competing bid for the Debtor's equity, and the Designation Motion. ECF 452, 515-5, 518, 542, 565.

## V.     Jurisdiction and Legal Standards

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a "core proceeding" under 28 U.S.C. § 157(b)(2). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure, made applicable to this matter by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

Sections 1125 and 1129 of the Code govern a plan proponent's disclosure statement and plan of reorganization. Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Section 1129(a) in turn states that "[t]he court shall confirm a plan only if all of the … requirements [of that section] are met." 11 U.S.C. § 1129(a).

The plan proponent bears the burden of proof on each of the confirmation requirements under section 1129(a). *See, e.g.*, *In re Bate Land & Timber, LLC*, 523 B.R. 483, 489 (Bankr. E.D. N.C. 2015). The plan proponent must, in turn, satisfy this burden by a preponderance of the

evidence.[7] Consequently, the plan proponent must present sufficient evidence to show that the plan, among other things, was filed in good faith and not by any means prohibited by law, satisfies the applicable provisions of the Code, pays creditors at least as much as they would receive in a hypothetical chapter 7 liquidation case, and that all impaired classes of claims voted to accept the plan.[8] 11 U.S.C. § 1129(a).

If a plan does not garner sufficient creditor support to satisfy section 1129(a), the plan proponent nonetheless may seek to confirm the plan under section 1129(b) of the Code. Section 1129(b) is referred to commonly as the "cramdown" provision of the Code. The cramdown provision requires the plan proponent to show that at least one class of impaired claims voted to accept the plan. If that factor is met, "[t]he court … shall confirm the plan notwithstanding the requirements of [11 U.S.C. § 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims and interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

The Debtor seeks confirmation of the Debtor's Plan under section 1129(a) and (b) of the Code. The Creditor argues that confirmation is not possible because the Debtor's Plan improperly classifies the Creditor's claim, thus violating sections 1126 and 1129(a) of the Code, and violates

---

[7] *See, e.g.*, *Bate Land & Timber*, 523 B.R. at 489 ("'In the face of this silence, courts may not imply a higher standard than the preponderance standard normally applied in civil proceedings.'") (quoting *In re Combs*, 838 F.2d 112, 116 (4th Cir. 1988)). A plan proponent must satisfy each applicable subsection of section 1129(a) in order to have its plan confirmed.

[8] Section 1126 provides in relevant part that,
> (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.
> (d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126.

the absolute priority rule set forth in section 1129(b). The Debtor strongly contests the Creditor's position and urges the Court to, among other things, designate the Creditor's vote under section 1126(e) of the Code and confirm the Debtor's Plan.

The Court addresses these and other issues raised in the context of confirmation in its Findings of Fact and Conclusions of Law below.

## VI.    Findings of Fact

The Court had the opportunity to observe the fact and expert witnesses during the three days of the evidentiary portion of the Confirmation Hearing. The Court has considered the witnesses' testimony, as well as the documents admitted into evidence, during the Confirmation Hearing.[9] The Court's general findings of fact are set forth in this Part VI. The Court provides additional findings of fact in the context of its analysis and conclusions of law in Part VII.

The Debtor and the Creditor offered several witnesses and numerous documents to support their respective positions on confirmation of the Competing Plans.[10] The Court focuses here on

---

[9] The Court sets forth certain specific references to the hearing transcripts and documents admitted into evidence in the footnotes of this Memorandum Opinion solely to allow for the provision of more (rather than less) information; the use of footnotes is not intended to minimize the importance of the materials or their relevance to the Court's holding. For ease of reference, the transcript of the October 26, 2023, hearing is referred to herein as "Tr. 1"; the transcript of the October 27, 2023, hearing is referred to herein as "Tr. 2"; the transcript of the October 30, 2023, hearing is referred to herein as "Tr. 3"; and the transcript of the November 1, 2023, hearing is referred to herein as "Tr. 4." Moreover, the Court reviewed and considered only those exhibits admitted into evidence without objection.

[10] The Court relies only on witness testimony specifically identified in this Memorandum Opinion. Testimony not specified herein was either irrelevant, not helpful to the Court's evaluation of the issues, or not credible.

In addition, to the extent that either party raised a relevancy objection to any part of the testimony included in this Memorandum Opinion, the Court evaluated the objection under Federal Rule of Evidence 401 and found the testimony helpful to the Court's analysis of the particular issue and that any potential prejudice was significantly outweighed by the value of the testimony to the Court's consideration of this matter. *See* Notes of Advisory Committee on Proposed Rules to Fed. R. Evid. ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand. James, *Relevancy, Probability and the Law,* 29 CALIF. L. REV. 689, 696, n. 15 (1941), in Selected Writings on Evidence and Trial 610, 615, n. 15 (Fryer ed. 1957)."); *U.S. v. Tillmon,* 954 F.3d 628, 643 (4th Cir. 2019) (Rule 403 states that a district 'court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice ... or needlessly presenting cumulative evidence.' Fed. R. Evid. 403. 'Rule 403 is a rule of inclusion, generally favoring admissibility.' *United States v. Udeozor,* 515 F.3d 260, 264–65 (4th Cir. 2008) (internal quotation marks omitted). Specifically, we have said that

9

the witness testimony and documents relevant to the Court's consideration of the section 1129 requirements and the Designation Motion.

The testimony of the Debtor's employees clearly established that the Debtor's employees fully support the Debtor's Plan and would not agree to work for the Creditor.[11] The Debtor generally elicited this testimony in the context of the proposed confirmation of the Creditor's Plan, but the questioning was broad enough to cover the consequences of a successful bid by the Creditor under the Debtor's Plan. Although the Court does not rely on all of the testimony offered by the Debtor's employees, it did find the testimony concerning these two points credible.

The Debtor's employees also spoke to their experiences working for the Debtor and for the Creditor. These witnesses all expressed respect for, and loyalty to, the Debtor and the Principal,[12] but also acknowledged that the Creditor treated them well when they were in the Creditor's employ.[13] Their negative comments concerning the Creditor stem primarily from the longstanding

---

when considering whether evidence is unfairly prejudicial, 'damage to a defendant's case is not a basis for excluding probative evidence because evidence that is highly probative invariably will be prejudicial to the defense.' *Basham,* 561 F.3d at 326 (internal quotation marks omitted). Instead, '[u]nfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground *different from proof specific to the offense charged.*' *Id.* at 327 (internal quotation marks omitted) (emphasis added).").

[11] Glen Womack, Timothy Ingram, Mary McCannon, and Cindy Wood all testified at the Confirmation Hearing. Tr. 1, ECF 585, at p. 79 (Womack: "A. I did it because, you know, I didn't think I could go back to work there because I was so satisfied where I was -- where I was at. Q. If management were to change and William Cleary, Shirley Cleary would come back into management of Cleary Packaging, what would you do in that event, if anything? A. Well, I don't think I could go back because -- and this was a lot of changes made. I don't think I could go back to work for Cantwell again."); p. 165 (Ingram: "A. Well, with all the lawsuits and everything that's going on, I've been called everything from a liar, a snake, a thief, everything under the sun, basically, and told I wasn't trustworthy, that I just can't work there. If -- if -- if William Cleary or Ms. Shirley Cleary takes over, it's going to create an atmosphere that I don't want to work in."); p. 116 (McCannon: "A. I'm just not going to work for Cantwell-Cleary, for Mrs. Cleary or William Cleary."); p. 186 (Wood: "Q. If Cleary -- Cantwell-Cleary were to come in and their plan is successful, what would your intention be working under a Cantwell-Cleary plan? A. I couldn't do that again. Never again.").

[12] Tr.1, ECF 585, at p. 76 (Womack: "And I couldn't be at a better place right now."); p. 116 (McCannon: "I would actually enjoy to stay working at Cleary Packaging."); p. 165 (Ingram: "I will do everything in my power to make sure that Cleary Packaging does meet their commitments. I'll work harder than I've ever worked before."); p. 192 (Wood: "Q. And you're very loyal to Mr. [Vincent] Cleary, correct? A. I think he's a wonderful businessman. Yes.").

[13] Tr. 1, ECF 585, at p. 99 (Womack: "Q. And Cantwell-Cleary was very loyal to you as well? A. Very loyal"); p. 121 (McCannon: "Q. Okay. Cantwell-Cleary, they were good to you? A. Yes. Q. They were loyal to you? A. Yes."); p. 166 (Ingram: "Q. Cantwell-Cleary was pretty good to you? A. Yes. Q. Loyal to you? A. Yes. Q. You enjoyed working there? A. Yes, I enjoyed working there."); p. 186 (Wood: "Q. Cantwell was pretty loyal to you? A. While I was an employee. Q. Were they good to their employees? A. Yes.").

disputes between the Principal and the Creditor. As the Court indicated during the Confirmation Hearing, it cannot revisit the merits of the state court litigation between the Debtor and the Creditor.

The Debtor offered three experts on its hypothetical liquidation analysis, and one of these witnesses also testified concerning the Debtor's five-year projections in support of the Debtor's Plan.[14] The Court found all three expert witnesses credible, thoughtful, and knowledgeable in their particular fields, subject to the qualifications noted below.

The first such witness was Mr. Carl Miceli of Miceli Appraisers & Liquidators, Inc., who focused on the value of the Debtor's inventory in the context of a hypothetical liquidation. Mr. Miceli explained his process and assumptions, and he offered two different valuations for the Debtor's inventory and certain other personal property: an orderly liquidation value of $122,596.00, and a forced liquidation value of $86,577.00.[15]

The second such witness was Mr. Joseph Bellinger of Bellinger Legal Services, Inc., who previously served as a chapter 7 trustee in this district and also testified concerning liquidation value. Although Mr. Bellinger generally agreed with Mr. Miceli's approach and thoughts on valuation, he opined that Mr. Miceli's valuations (as well as the Debtor's in its liquidation analysis) likely were on the high side, given the realities of a chapter 7 case and liquidation.[16]

---

[14] At the Confirmation Hearing, the Creditor renewed its objection to the testimony of certain of the Debtor's expert witnesses based on the Debtor's failure to timely disclose those witnesses or to otherwise amend its discovery responses. As the Court observed in its prior order on this dispute, the Debtor's disclosure of its expert witnesses in this case is certainly not best practices. ECF 558. Nevertheless, the Court will consider the expert testimony and confirm its prior ruling on this dispute based on the totality of the circumstances of this case, including what was disclosed in the Debtor's discovery responses and by counsel during hearings before the Court, the ability of the parties to depose the expert witnesses prior to the Confirmation Hearing, the timing of the Creditor's depositions of certain witnesses (specifically Mr. Magas and the Principal) known well before October 2023, and the Court's balancing of the potential prejudice to the parties and benefit to the Court's consideration of this case.

[15] Tr. 1, ECF 585, at p. 32.

[16] Tr. 1, ECF 585, at pp. 47, 56–59.

The third such witness was Mr. George S. Magas, who is a certified accountant retained by the Debtor as a professional in this case. ECF 36. As the Debtor's accountant, Mr. Magas testified that he works with the Principal and Ms. Wood to prepare the Debtor's monthly operating reports ("MORs") in this case.[17] He also helped prepare the liquidation analysis and the five-year projections attached to the Debtor's Plan. With respect to the Debtor's liquidation value, Mr. Magas agreed with Mr. Miceli and Mr. Bellinger that creditors would receive as much, if not more, under the Debtor's Plan than in a hypothetical chapter 7 liquidation.[18]

Although the Court accepts the general proposition that the Debtor's continued operations will generate more value than a liquidation of the Debtor, particularly given the nature of the Debtor's assets and business,[19] the Court does have concerns regarding the information relied upon by these experts, as well as by the Debtor's valuation expert, Mr. Raymond Peroutka.[20] Each of the Debtor's expert witnesses testified that they relied primarily, if not solely, on information provided by the Debtor, the Principal, and Ms. Wood. None of the Debtor's experts sought to independently verify any of the information provided by the Debtor, the Principal, or Ms. Wood.[21]

---

[17] Tr. 1, ECF 585, at pp. 199–201. Debtor's Exs. 13–18.

[18] Tr. 1, ECF 585, at p. 209. Debtor's Ex. 8.

[19] *See, e.g.*, Tr. 2, ECF 586, at 182 (Principal: "Q. And the company -- what are the assets that have any value, in your opinion, that could be sold? A. That could be sold or what are the assets? Q. We'll start with what are the assets? A. Asset number one is the people. Individuals. Q. Okay. A. That's the -- without that, it's small potatoes.").

[20] Both valuation experts offered to the Court used an income-based approach to valuation. The Debtor's valuation witness, Mr. Peroutka, used a discounted cash flow approach with an overall discount rate of 20.54%. A discounted cash flow approach relies heavily on the entity's terminal value and discounts future earnings to present value. The Creditor's rebuttal valuation expert, Mr. Charles McBee, used a capitalized earnings approach and an overall discount rate of 16.68%. A capitalized earnings approach is similar to a discounted cash flow analysis, except that it analyzes an entity's income for a certain period (usually one year) and divides that income by the entity's capitalization rate. Using these two income-based methodologies, Mr. Peroutka's average valuation of the Debtor's equity was -$74,000; Mr. McBee's average valuation of the Debtor's equity was $1.6 million. As discussed further below in the context of the Court's Analysis and Conclusions of Law, the difference in valuations stems, in part, from the use of different industry discount factors and the data relied on for the valuation (Mr. Peroutka used the Debtor's projections; Mr. McBee used the Debtor's 2022 tax return).

[21] *See, e.g.*, Tr. 1, ECF 585, at 40–41 (Miceli: "Q. Did you conduct any independent investigation or analysis to determine whether there are any companies in the packaging space who might be interested in buying those boxes? A. I did not. Q. You just took -- you accepted Mr. Cleary's position that no one would buy it? A. Correct."); p. 230 (Magas: "Q. Okay. So Vince told you that sales -- salaries and payroll expenses should increase because you need to hire additional people, additional sales folks? A. Well, I think that would -- you know, I would know that without

12

Indeed, several of the experts stated that they were "told to accept" a certain statement or fact as true.[22]

The resulting factual problem is that this approach limits the utility of the Debtor's expert witnesses. The experts certainly helped the Court understand how the Debtor's information would translate into value under various methodologies, but the experts did not necessarily assist the Court with understanding the particulars of the Debtor's industry, the industry's objective perspective of the Debtor or the marketability of the Debtor's equity or assets, the condition of the Debtor's assets, or even (in some respects) the accuracy of the Debtor's books and records.

That said, as further explained below in Part VII, the Court does not find the valuation issues determinative in this case. Valuation is only one component of the new value analysis and the confirmation process. Even if the Court did rely on the valuations proposed by the Debtor's experts, the Debtor's Plan would still fail under the absolute priority rule of section 1129(b) of the Code.

The remaining three witnesses were all members of the Cleary family: the Principal, Mrs. Shirley Cleary (the Principal's mother), and Mr. William Cleary (the Principal's brother). Much of the testimony from these individuals focused on events leading up to the Creditor's termination of the Principal in June 2018 and what followed. Some of this testimony is relevant to

---

asking him. I mean, if he's going to hire somebody extra or maybe one person or two, we're going to have more -- more expenses on that. But we hope to offset that with increased sales. Q. Okay. But when you did these projections, you relied on information that Mr. Cleary told you? A. I did. Q. Okay. And did you do anything to verify this information? A. It's a possibility. I don't know how we can verify it."); *see also* Tr. 2, ECF 586, p.121 (Peroutka: "Q. You didn't reach out to Associated Paper, or any of the people that you just indicated in your testimony, to find out whether those discussions occurred; did you? A. I didn't speak with them, no. Q. And do you know whether Mr. Cleary was talking to Associated and Atlas, or whomever it might be, about: 'Hey, would you be interested in buying my 100 percent controlling interest in Cleary Packaging?' Do you know whether that conversation happened? A. Do I have personal knowledge that that conversation happened? No. My testimony was that I was told that that happened, and I relied upon it.").

[22] *See, e.g.*, Tr. 1, ECF 585, at 41 (Miceli: "Q. You just took -- you accepted Mr. Cleary's position that no one would buy it? A. Correct."); Tr. 2, ECF 586, at p. 135 (Peroutka: "Q. Is that not correct that you were asked to accept and rely on the projections as drafted by Mr. Magus, rather? A. I was, yes.").

matters before the Court; specifically, the Court must evaluate the claims by both the Debtor and the Creditor that the other is causing harm or damage to it (or motivated solely by that objective). The Court also considers the individuals' testimony concerning the Competing Plans, with emphasis on implementation and distributions to creditors.

The Principal's testimony aligned with much of that provided by the Debtor's other witnesses. The Principal, like every other witness, stated that the Debtor's operations are profitable and that the Debtor is doing well.[23] The Principal discussed various industry awards that he or the Debtor has received during the bankruptcy case.[24] The Principal also acknowledged having sufficient cash flow to meet the Debtor's obligations, though he did state (as did Ms. Wood) that certain creditors have changed credit terms since the filing of the bankruptcy case.[25]

---

[23] *See, e.g.*, Tr. 1, ECF 585, at p. 193 (Wood: "Q. Okay. And how was Cleary Packaging doing? A. They're doing wonderful. Q. Doing very well, right? A. Yes, they're doing well."); *id*. at p. 215 (Magas: "Q. And by the way, maybe before I get there, company is doing very well, right? A. I think it is, yes. I think it's well-run and it shows. Q. And it's cash – it's been cashflowing positive throughout the bankruptcy? A. Yes. So far so good."); *id*. at p. 224 (Magas: "Q. Okay. And I just want to take you to September of 2023. What were the operating -- these are -- the operating expenses through September of 2023 are how much? A. 770,223. Q. Okay. And I think you heard perhaps Ms. Wood testify that she would also agree with you that the company is doing -- the company is profitable, healthy, and as of September 2023, the profit is 178,176. A. That's correct."); *id*. at p. 233 (Magas: "Q. Well, and you heard earlier -- we can go back to the September operating report, but the cash as of September 30th, we're about $645,000. A. That's correct, yes. Q. And you would agree that the company has been profitable during the bankruptcy, correct? A. I agree. Q. It's been cash-flowing positive during the bankruptcy? A. I agree. Q. It's been able to pay all of its expenses when they come due? A. I agree."); Tr. 2, ECF 586, at 244 (Principal: "Q. Okay. But the company's been profitable since it's been in bankruptcy; correct? A. We've worked hard every month to try to make sure our bottom line is profitable. I can't say every month it has. But we've worked hard to stay ahead of it and to -- and, really, just be tight on all of our spending, yes.").

[24] *See* Tr. 2, ECF 586, at pp. 185–187.

[25] *See, e.g.*, Tr. 1, ECF 585, at p. 194 (Wood: "Q. $645,381.41 was the cash balance? A. That's correct. Q. And company -- while you've been in bankruptcy, you haven't had any cashflow problems, have you? A. No. We've had – we've had to do some special things to get COD vendors paid, I mean, that we would normally never have had to do. Some vendors -- once you're filing bankruptcy, they want either money up front or some kind of full payment depending. So that has hindered."); Tr. 2, ECF 586, at p. 176 (Principal: "Q. You obtained approval from Judge Alquist in your bankruptcy case to provide lending in a revolving loan to Cleary Packaging; is that correct? A. That's correct. Q. And why did you do that? Why did you ask for a loan to facilitate Cleary Packaging's operations? A. For cash flow reasons, we had bills to pay when we asked for that. And I utilized it to pay, I believe, two vendors at that time. Q. Once you filed bankruptcy, what happened to your credit terms, if anything, with your suppliers? A. It was -- the credit terms -- we have a lot of suppliers. It varied wildly. Most of them, it went to zero credit. A number of them it went to cash in advance or credit card."); *see also* Tr. 1, ECF 585, at p. 10 (Magas: "Q. So, we established yesterday that Cleary Packaging has not had any cash flow problems while it was in bankruptcy; is that correct? A. That is correct. Q. It's been able to pay all of its expenses when they come due? A. That is correct.").

14

In addition, the Principal discussed his efforts to market his equity interest in the Debtor. As noted above, all of the Debtor's experts relied on the Principal's representations that he had spoken with many potential purchasers in the industry and that no party was interested in an acquisition or investment because of the litigation between the Debtor and the Creditor and the fact that the employees would leave in the context of a sale. The Principal's testimony reiterated this position. Except for one potential purchaser,[26] the Debtor did not produce or offer any other evidence, however, to support the Principal's position.[27]

Moreover, the Principal clearly stated his refusal to offer a plan of reorganization that requires payments to creditors for a period longer than 60 months. His justifications for this plan period included that the process is wearing and that he just wants a fresh start and this all behind him.[28] The Principal did not indicate any financial, business, or other reasons for not paying more

---

[26] *See, e.g.*, Tr. 2, ECF 586, at p. 218–219 (Principal: "Q. Okay. Why is it so -- when you say it's done this way and people don't put it in writing, there came a time that you were negotiating with Atlas Container Corporation. That ended up in writing; right? A. Yes, sir, it did. Q. Tell me: What's the difference? A. What took it with Atlas to the next step -- I'll call it the next step -- is he actually started out by saying, 'Hey, I have an interest in talking. More than that. What can you tell me?' Where others told me they wouldn't touch us with a 10-foot pole or who were absolutely crazy to even think of doing anything because of all the litigiousness and the salespeople. So with Mr. Centenari at Atlas, he actually said, 'Let's talk. I'm interested.' But before we could do that, I think our next step was getting a little further in anything, there had to be an NDA. That was the only one that got to that point out of probably a dozen or so people. We had -- I had discussed."). Creditor's Ex. 33.

[27] *See, e.g.*, Tr. 2, ECF 586, at p. 218 (Principal: "Q. Okay. Do you have any – I'm going to put Atlas aside for a moment. Do you have a single text message, a single email, any written document evidencing these discussions? A. When you have these discussions in our industry, you don't advertise them in the -- well, I say classified, but the internet -- classified, anything. You just don't do that. You don't put them in emails and they don't want to get it in emails because word gets out on the street. It's not something that you want to post on the internet or be seen. So that's not how this industry works. It's detrimental to the company. Q. Okay. So there are no writings. Any of these discussions allegedly were oral. A. They weren't allegedly. But yes, they were oral. They were face-to-face.").

[28] Tr. 2, ECF 586, at pp. 172–173 (Principal: "A. I want to be very optimistic. And I want to move forward. I want to do what I enjoy doing and I love doing with the people I love working with. And I want to run a successful company, work with successful people, and pay what we can pay and commit as we heard yesterday from -- made me proud of the individuals that came in here. We want to get through this. We want to pay this and move on with our lives. This has just been five years -- that we would like to move on and get a fresh start. … Q. You've heard commentary both during the hearings before this, even today, in terms of lengthier plan. You've got a 60-month plan that you proposed; correct? A. Yes, that's correct. Q. What is causing you to not consider to go beyond five **ye**ars at this point? A. Well, you don't want to be morbid, but I look at my life, and I'm close to 58 by the time this is kicking off, I guess. I want to enjoy my time. I want to enjoy my time with my kids. Grandkids. Things like that. And just to continue to staying for years and years, it's just – it wears on you. That's what it does.").

to creditors. Notably, the Debtor's expert witnesses and the Principal all testified that the Debtor's business is doing well and is profitable.[29]

The Principal did state that he "accepted" the state court judgment in the litigation between the Debtor and the Creditor.[30] He did not provide any testimony, and the Debtor did not offer any other evidence, that the Principal and the Debtor are using their best efforts to maximize returns to creditors, including the Creditor, in this chapter 11 case. The Principal's overall testimony and demeanor on the stand suggest that he wants to pay as little as possible to at least the Creditor and keep the excess value and the business for himself.[31] The Debtor's other evidence supports this inference, given the relatively little financial pain that the Principal will experience under the plan and the significant value and benefits he will retain not only during the plan term but also, and perhaps more so, after it ends.[32]

As for the Creditor, it offered as witnesses (in addition to its rebuttal witness) the two other members of the Cleary family noted above, Mrs. Shirley Cleary and Mr. William Cleary.

Mrs. Cleary, the Principal's mother and partial owner of the Creditor, testified concerning the history of the family business and the factors leading up to the termination of the Principal's employment with the Creditor. Mrs. Cleary explained that the Principal had been running the Creditor's business but that a rift developed between her and the Principal after her husband's death in 2014.[33] Mrs. Cleary noted that the Principal approached her about buying out her interests

---

[29] *See supra* notes 23–25. *See also* Debtor's Exs. 8, 13–18.

[30] Tr. 2, ECF 586, at p. 171.

[31] The Court closely observed the Principal during his testimony. The Principal is clearly proud of what he has built at the Debtor and his success in the industry. Although he said that he was "sad" and "sorry" concerning the circumstances that preceded the bankruptcy case, the Principal's demeanor, expression, and tone showed little remorse during his testimony on October 30, 2023. *See id.*

[32] *See, e.g.*, Tr. 1, ECF 585, at pp. 215–216 (Magas explaining salary, commissions, and benefits received by the Principal); *see also* Tr. 2, ECF 586, at pp. 161–164 (Peroutka: "Q. Okay. So -- but all of these benefits that we just went through: Salary, company vehicle, taxes being paid, health insurance, and a company that had gross -- that had profits in 2022 of $353,000, that your opinion that Mr. Cleary's equity interest is worth zero? A. That's correct.").

[33] Tr. 3, ECF 594, at pp. 14–15.

16

in the Creditor but those negotiations failed.[34] She further explained that the Creditor subsequently elected to terminate the Principal after learning that the Principal was planning to start his own business.[35]

Mrs. Cleary discussed her current involvement with the Creditor and the Creditor's objectives in this chapter 11 case. She asserted that the Creditor was only interested in getting paid and that the Debtor's continued operation would be the best way to ensure payment of the state court judgment.[36] She denied wanting to put the Debtor out of business. She also stated her belief that the Principal's and the Debtor's conduct has caused significant harm to the Creditor's business.[37]

Mr. William Cleary, the Principal's brother and the current president of the Creditor, testified regarding many of the same facts discussed by Mrs. Cleary and several of the other witnesses. Mr. William Cleary explained his involvement in the Creditor's business, his observations concerning the termination of the Principal, and the events subsequent to the Principal's departure from the Creditor on June 18, 2018.[38]

---

[34] *Id*. at p. 15.
[35] *Id*. at p. 17.
[36] *Id*. at pp. 46–47 (S. Cleary: "Q. What would happen if Cleary Packaging was unable to operate? A. Yes. If they were unable to operate, we wouldn't be able to receive anything that Judge Crooks and Judge Mulford and a jury awarded the company for all the damages that was -- Q. Okay. A. -- caused by them. So we definitely -- we would like them to stay into business. Yes. … Q. Do you believe that if Cleary Packaging closed its doors that Cantwell-Cleary would recapture Sephora and all the other customers that left? A. No, sir. I don't really believe that would happen. Q. Why do you say that? A. Well, there's a couple of reasons. One thing, their salespeople will take off and go to other paper packaging companies with the group of customers. And the second one is that Sephora refused -- after they left, refused to see Bill -- see Cantwell-Cleary in their door again. Told him to stay out. They want nothing to do with Cantwell-Cleary. We didn't know why, and he tried a couple of times. But they absolutely refused. So we don't know what was told them, but so that's as far as Sephora goes and some of the others. And we still don't have all the experienced salespeople. It would be quite a challenge to go in and regain the customers back.").
[37] *Id*. at p. 48.
[38] *Id*. at pp. 53–55.

Like Mrs. Cleary, Mr. William Cleary firmly stated that the Creditor's objective was payment of the state court judgment.[39] He indicated that the Debtor's continued operation would help fund that payment but that he found the Debtor's treatment of the Creditor's claim under the Debtor's Plan unfair and unacceptable.

Mr. William Cleary also described the Creditor's purpose in filing the Creditor's Plan. He stated that the Creditor was trying to propose an alternative to facilitate greater recoveries for creditors in the case, including recoveries for the Creditor on the state court judgment. Mr. William Cleary's testimony was very clear, however, regarding the need for the Debtor's business to continue in some form under the Creditor's Plan for that plan to be successful. He stated, "it would harm us if they were put out of business and were no longer able to pay." Tr. 3, ECF 594, p. 75.

Mr. William Cleary also denied filing the Creditor's Plan to put the Debtor out of business, which he observed would not likely mean additional business for the Creditor. Mr. William Cleary explained the reasons behind his position to include facts such as the personal relationships that exist between a salesperson and a customer and that most customers would likely follow the salespeople, as well as the confusion and disruption that the ongoing disputes between the Debtor and the Creditor have caused in the industry.[40]

---

[39] *Id*. at p. 75 (W. Cleary: "Q. Okay. Mr. Cleary, tell me what Cantwell-Cleary's objective is in this bankruptcy case. A. Cantwell-Cleary's objective is to -- is to receive payment for -- receive payment for the judgment that had been levied in the district court. Q. Okay. In the circuit court in Anne Arundel County? A. In – I'm sorry. The circuit court. Sorry. Q. Okay. A. Terminology. Q. And there have been lots of representations that Cantwell-Cleary's sole objective is to put Cleary Packaging out of business? A. That's one of many false representations. Q. Okay. A. Correct. It -- it would harm us if they were put out of business and were no longer able to pay.").

[40] *Id*. at p. 76 (W. Cleary: "A. If Cleary Packaging was put out of business, some -- a basic assumption people might have is that -- is that all those accounts would come back to Cantwell-Cleary. It'd be a big disruption in the marketplace. Many of those customers may not want to deal with another Cleary after that point. And so there'd be some disruption there. Also, other competitors would then try to come in and do that. We would have -- we would have the ability to try to obtain some of those customers. But if Cleary Packaging was still running the company, okay, and still producing and they've shown that -- well, they haven't shown, but they -- they have the ability to pay. They're -- they're doing very well. Okay. That's probably our best opportunity to -- to be paid and -- is through them. Q. Okay. And in fact, if Cleary Packaging ceases operations, that would impair the ability of Cantwell-Cleary to receive the maximum recovery; is that a fair statement? A. That's a fair statement.").

18

Mr. William Cleary did not deny meeting with Mr. McElderry, who testified as part of the Debtor's evidentiary case concerning certain statements allegedly made by Mr. William Cleary about the Debtor. According to Mr. McElderry, Mr. William Cleary said that the Debtor was going into bankruptcy and out of business; Mr. McElderry viewed Mr. William Cleary's solicitation as an attempt to steal business from the Debtor.[41] Mr. William Cleary stated that his interaction with Mr. McElderry was short and that he did not remember the conversation that way.[42]

Both Mrs. Cleary and Mr. William Cleary acknowledged making negative statements about the Debtor or the Principal.[43] They also both asserted that the Debtor and the Principal have done the same to the Creditor—e.g., saying that the Creditor is going out of business, contributing to confusion in the industry and market concerning the two companies, etc.[44]

The Court found the testimony of Mrs. Cleary and Mr. William Cleary credible. They were both composed on the stand and were not flustered or taken aback by any of the questions asked by Debtor's counsel.

Again, the Court observes that some of the testimony offered during the Confirmation Hearing related more directly to the issues underlying the state court litigation than the facts relevant to confirmation of a plan under section 1129 of the Code. The Court acknowledges that the Debtor argued bad faith and misconduct in support of the Designation Motion and its objection to the Creditor's Plan, but the Court found little relevance in the testimony and evidence regarding the Principal's departure from the Creditor.

Focusing on events relevant to this chapter 11 case, the Court finds that the Principal is a very good businessperson and that he has developed strong relationships with his employees, his

---

[41] Tr. 1, ECF 585, at pp. 142–145.
[42] Tr. 3, ECF 594, at 72–73, 98.
[43] *See, e.g.*, *id*. at pp. 32–36, 70–71. Debtor's Exs. 27–36.
[44] *See, e.g.*, *id*. at pp. 25–26, 47–48, 55–58, 60–63, 73–74, 103. *See also* Creditor's Ex. 34.

19

customers, and people in his industry. As the Principal indicated, the Debtor has received several awards in the industry during this chapter 11 case and is doing very well.

Mr. William Cleary acknowledged that the Creditor cannot compete with the Debtor. It can, however, use the money paid on its claim to help rebuild some of the Creditor's business. The Court finds, based on the testimony of Mrs. Cleary and Mr. William Cleary, that the Creditor's *primary* objective in this case is maximizing its recovery on the state court judgment. The Court is not convinced, however, that the Creditor's Plan would serve that purpose or is otherwise confirmable. Indeed, the evidentiary record demonstrates that the Creditor has little prospect (or strategy) for retaining the Debtor's employees and customers or otherwise facilitating a reorganization of the Debtor's business.

The Court observes that there is unflattering testimony on both sides of this contested matter. The Debtor argues that the Creditor has made disparaging remarks about its business and does not want to see it succeed. The Creditor argues the same with respect to the Debtor, namely that the Debtor has made disparaging remarks about the Creditor's business and appropriates the Creditor's business and employees at every opportunity.

The Court finds that the unflattering testimony and related evidence offered by each side fails to show conduct of the kind necessary to meet either party's burden of proof under section 1129(a)(3) or, with respect to the Designation Motion, under section 1126(e). The Debtor offered no evidence that any of the Creditor's alleged conduct caused financial or other harm to the Debtor's business. The evidence does show, however, that the Creditor's primary motive in this case is maximizing its recovery on the Claim. On the other side, the Creditor offered evidence of harm to its business from the Debtor's alleged conduct, but that evidence is not relevant to the

20

issues before the Court. The Court found much of this testimony and evidence either irrelevant or insufficient to support the legal propositions for which they were offered.

**VII.   <u>Analysis and Conclusions of Law</u>**

This is a chapter 11 case. It is not a chapter 7 liquidation. It is no longer a case under subchapter V of chapter 11. The Court thus focuses on the requirements of chapter 11 of the Code and whether the respective plan proponents have done enough to obtain confirmation of their plans. For the reasons set forth below, the Court finds that neither the Debtor nor the Creditor has satisfied its burden.

Chapter 11 is the traditional business reorganization chapter of the Code. It is intended to help distressed businesses reorganize their financial affairs and business operations while *maximizing* returns to creditors. It is not intended to serve only the debtor's objectives or to allow a debtor to minimize payments to its creditors under the guise of reorganization.

The structure of section 1129 of the Code contains various protections for creditors that cannot be overlooked or manipulated by a plan proponent. The plan proponent must be acting in good faith in the submission of its plan. It must allow creditors to vote on its plan, which vote may be based on the creditor's analysis of its proposed recovery under the plan. The plan must be feasible and not likely to be followed by a liquidation of the debtor. Further, under section 1129(b), when applicable, a debtor must ensure that its plan does not discriminate and is fair and equitable

21

to all affected creditors. The Debtor and the Creditor each failed to meet their evidentiary burdens on their respective plans.

### A.    The Debtor's Plan

#### 1.   Absolute Priority Rule

The Court starts with perhaps the most important component of any chapter 11 plan: the value being distributed to creditors in exchange for the debtor's ability to continue its business operations. The Code contains at least two specific provisions intended to serve this aspect of reorganization, sections 1129(a)(7) and 1129(b) of the Code. The Debtor's Plan satisfies the best interests test (i.e., hypothetical liquidation analysis) of section 1129(a)(7). It does not, however, satisfy the fair and equitable (specifically, the absolute priority) principle of section 1129(b).

The absolute priority rule is a bankruptcy concept that predates the Code. Often described as the bedrock of bankruptcy, the rule requires a plan distribution scheme to respect the priority of the claims and interests affected by the plan.[45] In simple terms, the absolute priority rule requires that each class of impaired and unaccepting creditors be paid in full prior to any junior class of claims or interests receiving any distributions under the plan.

No one disputes that the Debtor's Plan fails to pay all classes of impaired and unaccepting claims in full. The question then becomes whether the Principal can retain his equity interests in the Debtor without paying those claims in full. Bankruptcy law recognizes the challenges often posed by the absolute priority rule for business owners trying to restructure their finances and operations through bankruptcy. Often, despite the owners' good faith and best efforts, it is impracticable to pay all senior claims in full. The loss of business ownership in such a scenario

---

[45] The absolute priority rule generally provides that "creditors [are] entitled to be paid before the stockholders could retain [equity] for any purpose whatever." *N. Pac. Railway Co. v. Boyd*, 228 U.S. 482, 508 (1913).

can be not only devastating for the business owners but also prejudicial to the business' various constituents.

Two approaches have emerged to address the dilemma posed to prepetition equity holders of a chapter 11 debtor. First, Congress enacted subchapter V of chapter 11 of the Code to allow business owners to reorganize their business through a streamlined process and without the full burden of the absolute priority rule.[46] As noted by the U.S. Court of Appeals for the Fourth Circuit, however, subchapter V of the Code contains other protections for unsecured creditors in lieu of the absolute priority rule of section 1129(b)(2)(B),[47] some of which are not applicable in a traditional chapter 11 case. In a traditional chapter 11 case, courts have developed the new value exception to the absolute priority rule, which allows prepetition equity to purchase (and thereby retain) their ownership if certain conditions are met. The Debtor here relies, as it must, on the new value exception to the absolute priority rule.

      a.   The New Value Exception

The general contours of the new value exception are perhaps best described by the Supreme Court in *Bank of America Nat'l Trust and Savings Ass'n. v. 203 North LaSalle Street P'ship*, 526 U.S. 434 (1999). In *203 North LaSalle*, the Supreme Court held: "A debtor's pre-Bankruptcy equity security holders may not, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that

---

[46] A subchapter V debtor seeking to cram down a plan must still satisfy the traditional absolute priority rule for secured creditors but may utilize a "projected disposable income test" with respect to unsecured creditors. 11 U.S.C. § 1191(b), (c), (d).

[47] *Cantwell-Cleary Co., Inc. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509, 517 (4th Cir. 2022) (focusing on the role of the exception to discharge in section 523 of the Code in a subchapter V case). Indeed, subchapter V allows a debtor's principal to use sweat equity, future income, and other kinds of consideration as a means to retain the principal's ownership interest with respect to unsecured creditors. These concepts are embedded in the "projected disposable income" test of section 1191(b), (c), and (d) of subchapter V of chapter 11 of the Code. The Debtor is no longer pursuing a subchapter V plan but is now seeking the full discharge of all of its obligations to creditors under chapter 11 of the Code.

opportunity is given exclusively to the old equity security holders under a plan adopted without consideration of alternatives." *Id*. Lower courts have struggled to define appropriate "alternatives" in the context of the new value exception. More specifically, courts disagree concerning when a debtor must pursue a "market test" for the value of the new equity and when other means might suffice.

b.  <u>Factors to Evaluate Sufficiency of Proposed New Value</u>

In this case, the Court need not resolve whether a market test is required in every instance for the new value exception to apply. What is important is the evidence before the Court in this matter. As the Court explained in its Preliminary Order, "A market test may be necessary in certain cases if a debtor is not able to demonstrate new, substantial, and equivalent value through other admissible evidence …." ECF 442. Here, the Court has both the Debtor's evidence on new value and a competing bid/plan by the Creditor. The Court need only consider the former to resolve the issue.[48]

In doing so, the Court will rely on the five-factor test commonly used to evaluate new value. Those five factors require the new value to be (i) new, (ii) substantial, (iii) in money or money's worth, (iv) necessary for a successful reorganization, and (v) reasonably equivalent to the value of the stock being retained or received. *See, e.g.*, *Bonner Mall P'ship v. U.S. Bancorp Mort. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 908 (9th Cir. 1993), *cert. granted sub nom. U.S.*

---

[48] In its closing argument, the Debtor argued that the Court need not consider the valuations of the Debtor's equity because the Creditor filed a competing plan and that alone satisfied the market value test. The Court cannot accept the Debtor's position in this particular case. The market test component is not just a conclusory factor that finds sufficient new value if plan exclusivity has expired or an opportunity for bidding was provided; rather the market test has been identified as one of several ways that a court may evaluate the value of the reorganized debtor's equity and the proposed new value. Notably, even if the Court considered the Creditor's proposed competing bid or the Creditor's Plan, it appears that at least one other party (i.e., the Creditor) is willing and able to offer $250,000 in cash for the reorganized Debtor's equity, which would arguably provide meaningful returns to unsecured creditors in this case. In addition, any market test—regardless of how strong or competitive—speaks most directly to the "reasonably equivalent value" component of the five-factor new value test, and does not necessarily address the other four factors.

*Bancorp Mortg. Co. v. Bonner Mall P'ship*, 510 U.S. 1039 (1994), *motion to vacate denied and case dismissed*, 513 U.S. 18 (1994).[49] The Debtor bears the burden of proof on each of these five factors. *See, e.g.*, *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754 (Bankr. S.D.N.Y. 1995).

      c.  <u>The Parties' Valuation Evidence</u>

      The Debtor argues that the new value exception applies easily in this case because the Debtor's equity is worthless and the Principal is contributing positive value to the reorganization. The Court, however, is not convinced that the Debtor's equity is worthless. Mr. Peroutka's valuation is what it purports to be—a discounted cash flow analysis based on information provided by the Debtor.[50] That valuation changes if the Debtor's information underlying the projections is incorrect or inflated. That valuation also increases if the Debtor extends the plan by one year.[51]

---

[49] *See also, e.g.*, *In re Latam Airlines Group S.A.*, 620 B.R. 722, 801–802 (Bankr. S.D.N.Y. 2020) (applying these factors); *In re Platinum Corral, LLC*, No. 21-00833-5-JNC, 2022 WL 127431, at *12 (Bankr. E.D.N.C. Jan. 13, 2022) (analyzing in detail the application of these elements).

[50] As noted above, the discounted cash flow relied on assumptions in the Debtor's projections, which included expenses not necessarily aligned with historical numbers. *See* Debtor's Ex. 8. *See also, e.g.*, Tr. 1, ECF 585, at pp. 232–235; Tr. 2, ECF 586, at pp. 114, 134–135. In addition, Mr. Peroutka was asked to, and did accept, certain facts relevant to the assumptions, including the retention of employees and the marketability of the Debtor. *Cf.* Tr. 2, ECF 586, at 305 (McBee: "Well, as I said, with the exception of -- well, let's be clear. I'm not changing Mr. Magas's projection and bringing it down. I didn't do anything like that in my work. I don't -- I couldn't guarantee that salespeople were going to leave or revenue was going to stop in the future. I'm looking at an actual tax return. But as I said before, in risk rate, we were pretty close with one exception.").

[51] *See, e.g.*, Tr. 2, ECF 586, at pp. 150–154; pp. 101–102 (Peroutka: "Q. One moment, please. A somewhat unfair question, but the Court has inquired about the length of the plan. What impact, if any, would an extension of the plan by over 60 months have on your estimation of value, if any? A. It would have a positive impact. The positive impact of extending one additional year I think could be best estimated by evaluating the projection of the average risk scenario for the last year of the plan 2028, that the present value of that discrete year, the contribution of that last year is $35,717. That's the contribution toward the overall negative $74,000. So, if you extend the plan for the sixth year -- again, I haven't run that calculation, but looking at the individual year projections, my best estimate of extending it would be that it would probably add another $35,000 to the overall value on a present value basis. The actual amount would be higher than that, but for the present value calculation, approximately $93,000. Q. Higher, I'm sorry. Negative or positive? A. It would be a plus $93,000. So, it would cause the negative 74 to become a positive. Q. About $20,000?A. About $20,000, yes.").

The valuation methodology (discounted cash flow) also commonly is used for companies with an unmatured or unstable income stream.[52]

Mr. McBee's valuation methodology (capitalized earnings) avoids several of these issues but also is not perhaps completely aligned with the realities of this Debtor. The methodology generally is used to value companies with fairly mature or stable income streams and is based on actual results—here, the Debtor's 2022 tax returns. As Mr. McBee stated, he declined to use the Debtor's projections because they are at best a guess of the Debtor's financials.[53] Mr. McBee's discount rate may not fully capture the Debtor's debt repayment obligations.[54] It also is unclear whether the comparable transactions considered by Mr. McBee are representative of the kinds of factors that would affect a sale of the Debtor's equity in this case.[55]

The Court does not accept the conclusion of either valuation as representative of the actual value of the *reorganized* Debtor's equity; again, not because the Court questions either experts' knowledge or credibility, but rather because of the kinds of issues with each valuation noted above. The Court does find, based on the testimony of several witnesses, that the Debtor is a profitable business, has the ability to continue profitable operations in the future, and has particularly significant value to the Principal.

---

[52] Notably, debt servicing can be a factor that warrants use of a discounted cash flow methodology; however, other factors—such as a stable income stream—may mitigate against that approach. In a discounted cash flow analysis, as explained by Mr. Peroutka, the terminal value is the driver. *See* Tr. 2, ECF 596, at p. 168 (Peroutka: "Q. Okay. And is it also -- at the end of five years, we can agree, right, that whatever the percentage, if the plan's approved, that are required to be paid to creditors, at the end of five years, that baggage is behind the debtor; is that correct? A. That baggage is the terminal value of the entity that I've incorporated into my analysis. It is the perpetuity assumption of sales and profits into the future that are swept into the valuation, which is a negative number. So, notwithstanding the fact, yes, from year six through whenever, the debtor will benefit from those future profits, their value, when discounted to present value and coupled with obligations to pay creditors is a negative number. Q. Based on all the risks -- downward risk adjustments that we went through, that goes into your terminal value? A. All the assumption that we've gone through.").

[53] *See* supra note 50.

[54] Tr. 2, ECF 586, at pp. 314–315, 316–317, 319.

[55] The Court acknowledges that Mr. McBee used a comparable sales approach only as a secondary method to analyze the results of his capitalized earnings approach. Tr. 2, ECF 586, pp. 295–297.

d.  Analysis of Proposed New Value

The foregoing valuation issues require the Court to evaluate what the Principal offers as new value for his existing equity interests: (i) his sweat equity; (ii) the payment on his prepetition claim against the Debtor (arguably approximately $2,000 in wages and $47,000 in commissions); (iii) his $35,000 postpetition (and preconfirmation) loan to the Debtor; and (iv) $25,000 (presumably in cash) from his retirement account.[56]

The first two forms of proposed new value (i.e., sweat equity and debt forgiveness) are not considered "new," "substantial," or "money or money's worth" under the case law. *See Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) (holding that a promise of future labor warrants no exception to the absolute priority rule); *In re Ramba, Inc.*, 216 F.3d 394, 399–400 (5th Cir. 2005) (finding that new value must fit within one of the following categories: money, goods, services, new credit, or the release of property).[57] Courts place great emphasis on the proposed new value actually being "new" and in the nature of a fresh, outside capital infusion that will help pay creditors or otherwise aid the reorganization. *See, e.g., In re Sea Garden Motel & Apartments*,

---

[56] At the Confirmation Hearing on October 30, 2023, counsel for the Debtor indicated that the Principal could borrow more than originally anticipated from his retirement account and committed to a contribution of $25,000.00, increased from the $20,000.00 proposed in the Debtor's Plan. Tr. 3, ECF 594, at pp. 116–117.

[57] As at least one court has explained,

> To be substantial, new value must be a present contribution rather than a promise to pay in the future; it must be freely tradeable in the market by the debtor; and it must be an asset in the accounting sense. The contributor must be bearing a *new* economic risk—it is not enough that the contributor of "new" capital is simply continuing an existing risk, or only changing the form of an existing risk. Forgiveness of debt by itself is not sufficient.

*In re Creekside Landing, Ltd.*, 140 B.R. 713, 717 (Bankr. M.D. Tenn. 1992); *see also Matter of Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992) ("The Debtors first propose to obtain a release of their father's lien on their farm machinery and to pay the creditors the value of the machinery ($20,000) over five years. This contribution, however, is not an up-front infusion of money or money's worth. Like the promises of future labor rejected in *Los Angeles Lumber* and *Ahlers,* and the guarantees rejected in *Kham & Nate's Shoes,* the release of the lien 'has no place in the asset column of the balance sheet of the new [entity].'"); *In re Trikeenan Tileworks, Inc.*, No. BK 10-13725-JMD, 2011 WL 2898955, at *5–6 (Bankr. D.N.H. July 14, 2011) (acknowledging that one court has recognized the waiver of administrative claims as part of new value but holding, based on the facts before it, "the waivers of administrative and priority claims in this case are not new value because they are not necessary for a successful reorganization"); *In re Tucker*, No. 10-67281-fra11, 2011 WL 5926757, at *2 (Bankr. D. Or. Nov. 28, 2011) ("While it is laudable that the Debtors are willing to put additional personal money into the business to keep it going, the contribution of future salary does not, as the Court held at the November 3 hearing, constitute 'new value' as it is defined in *Ahlers*.").

195 B.R. 294, 302 (D.N.J. 1996) ("It is well established that the new value exception to the absolute priority rule will only apply 'where the infusion of capital comes from an "outside" source.'").

The Court also does not find a loan, which must be repaid (at least in theory at some point in time), to be new or money or money's worth. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1363 (7th Cir. 1990) (concluding that a guarantee of new loans is not a balance sheet asset, and it therefore cannot be treated as new value); *Sunflower Racing, Inc. v. Mid-Continent Racing & Gaming Co. I (In re Sunflower Racing, Inc.)*, 226 B.R. 673, 691 (D. Kan. 1998) (finding that a proposal to loan reorganized debtor $3.1 million was not substantial or money or money's worth).[58] Again, the concept of new value is intended essentially to measure the amount of new capital being infused into the debtor; it is not intended to capture lending or financing arrangements.

Finally, the Principal's proposal to pay $25,000 to the Debtor from his retirement account is in a form that may constitute new value. *See In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588 (6th Cir. 1986) (concluding that a $100,000 cash contribution created new value in light of the debtor's "risky industry" where income figures were unreliable); *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 197 (B.A.P. 9th Cir. 2003) (finding that debtor's contribution of either 3.7% or 4.4% of total unsecured claims was not substantial enough to constitute new value); *In re Sovereign Group 1985-27, Ltd.*, 142 B.R. 702, 710 (E.D. Pa. 1992) (holding that a contribution of only 3.6% of the unsecured claim was not substantial enough to constitute new value); *In re Snyder*, 967 F.2d 1126, 1132 (7th Cir. 1992) (concluding that a contribution is not substantial

---

[58] In addition, the Court notes that the Principal's loan to the Debtor has already been extended; it is not a new or substantial contribution of money or money's worth. *See* ECF 187. *See also, e.g.*, *Trikeenan Tileworks*, Nos. 10-13725-JMD, 10-13726-JMD, 10-13727-JMD, 2011 WL 2898955, at *5–6 (finding a loan not to be new value).

enough to constitute new value when the disparity between the contribution and the unsecured debt is so extreme). It does not, however and as explained below, constitute adequate new value.

One of the most important aspects of the new value exception is that it must be "substantial." The Court makes this observation because allowing prepetition equity holders to retain a postconfirmation equity interest undercuts the protections of the absolute priority rule. It says to the creditors, despite not getting paid in full, the debtor's equity holders may keep their ownership interests and all of the residual future value of the enterprise for themselves. That is not the typical bankruptcy bargain in a traditional chapter 11 case.

As the Court highlighted in the Preliminary Order, and explained by the U.S. Court of Appeals for the Ninth Circuit,

> The most conceptually difficult prong of the new value corollary may be the fifth-equivalence, which likely requires the bankruptcy court to determine a value for the reorganized debtor to be compared with the contribution. *Wholly de minimis contributions, however, simply fail the threshold analysis under the second prong, substantiality—a requirement separate and independent of equivalence, see In re Snyder*, 967 F.2d 1126, 1131 (7th Cir.1992). Commentators have observed that "prior to making the time-consuming determination as to whether the new value contribution is reasonably equivalent to the value being received [the equivalence prong], a significant number of courts have required that the new value contribution be 'substantial' in comparison to such things as" (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution. J. Ronald Trost, Joel G. Samuels, Kevin T. Lantry, *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification,* CA46 A.L.I.–A.B.A. 479, 552 (1995).

*In re Ambanc La Mesa Ltd. P'Ship*, 115 F.3d 650, 655 (9th Cir. 1997) (emphasis added).

The Debtor's proposed new value contribution pales in comparison to the total amount of claims in this case, the total amount of proposed distributions to creditors under the Debtor's Plan, and the percentage of creditor recovery in this case. For example, the Debtor's proposed $25,000.00 new value contribution represents .497308% of the total amount of claims in the case

(i.e., $5,027,068.28), and 1.81075% of the total amount of proposed distributions to creditors in the case (i.e., $1,380,643.00).[59] Moreover, and perhaps more importantly, the Principal is retaining his *100% ownership* in the Debtor while the Debtor pays creditors only *27% of their claims* under a 60-month plan. During this period, the Principal will continue to receive all of his benefits, salaries, and perks, and be entitled to the full residual value of the Debtor at the end of the plan term. The Debtor's proposed new value is not substantial and fails, among others, that factor of the applicable test.

In sum, the Debtor's plan fails the absolute priority rule of section 1129(b) of the Code.

### 2.    Vote Designation

The Debtor correctly points out that all creditors except the Creditor voted to accept the Debtor's Plan and appear to support not only the plan but also the Debtor's reorganization efforts. ECF 566, 572. This support is important and duly noted by the Court but it does not overcome the absolute priority rule discussed above. That said, the Debtor's argument that the Creditor's vote on the Debtor's Plan should be designated might, if granted, allow the Debtor to proceed to confirmation under section 1129(a) of the Code.[60] The Court does not, however, find adequate grounds in this case to designate the Creditor's vote.

Vote designation under section 1126(e) of the Court is an extreme remedy that is reserved for exceptional circumstances. As one court in this circuit has explained,

---

[59] As discussed above, the proposed $25,000 cash contribution is the only proposed new value that represents a fresh capital infusion to the Debtor. Sweat equity, debt forgiveness, and the extension of a loan are not adequate forms of new value under the facts of this case. They do not represent new capital that can be used to pay greater returns to creditors.

        To that end, the Debtor also has failed to show that any of the proposed new value, including the $25,000 cash payment, is necessary to the Debtor's reorganization. Likewise, there is no evidence in the record that the new value funds are necessary to continue the Debtor's operations or facilitate its reorganization.

[60] The Court does not opine on whether the Debtor's Plan could satisfy all of the requirements of section 1129(a) and be confirmed under that section, as the Court need not consider all of the 1129(a) factors given the Court's rulings herein and the Debtor's Plan's failure to satisfy section 1129(b).

> "Bankruptcy courts should employ § 1126(e) designation sparingly, as 'the exception, not the rule.'" *DBSD North America, Inc.* 634 F.3d at 101 (citing *In re Adelphia Commc'ns Corp.,* 359 B.R. 54, 61 (Bankr.S.D.N.Y.2006)). The party seeking to designate a vote as submitted in bad faith has a heavy burden of proof. *In re Adelphia Communications Corp.,* 359 B.R. 54, 61 (Bankr.S.D.N.Y.2006). Creditors have a fundamental right to vote on a debtor's Chapter 11 plan and designation of a creditor's vote is a drastic remedy. *Id.*

*In re Lichtin/Wade, LLC*, No. 12-0085-8-RDD, 2012 WL 6576416 (Bankr. E.D.N.C. Dec. 17, 2012).

The Code does not define bad faith or provide any meaningful guidance on vote designation in a chapter 11 plan. Section 1126(e) simply states that "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e). Courts thus focus on the specific facts of the case and whether the creditor's conduct "seeks to secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad faith." *Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am. (In re Figter Ltd.)*, 118 F.3d 635, 639 (9th Cir. 1997).

In this case, the record clearly shows animosity between the Debtor and the Creditor and between the Principal and the members of the Cleary family associated with the Creditor. The Court can easily find that the parties disagree about most things, do not support one another, and perhaps even dislike one another.[61] These kinds of emotions and feelings are not, however, facts

---

[61] *See, e.g.*, Tr.3, ECF 594, at p. 26 (S. Cleary: "It's very difficult being a mother in this position. I love my son very much. And I pray for him every day, as I do my other five children. I'm worry about him. I think continuing on this legal route that he is on, that it's going to cause harm to him and -- and to Bill, his brother. I can see the stress on him now. And his siblings that were in the company, he kind of ran them out of the company, you know, I guess because of what was going to be happening. But they've suffered. They've all now relocated in Florida. And it has been a -- a lot of stress on our family that I wish never happened. And we -- we do miss him, but we can't be around him because it's so toxic. We can't be in this area because it's so toxic with every -- we're so well known that -- we just escaped."); Tr. 2, ECF 586, at p. 171 (V. Cleary: "A. Just sorry we're here. Embarrassed. Just sorry that we're here. And it's depressing to be here and to go through this, and go through this over the years. And it's just, um -- just to continue this process and tear apart the family. And the family's been torn apart. So it's all those. Sad, depressing.").

that show bad faith rising to a level warranting vote designation, particularly when analyzing the Creditor's vote on the Debtor's Plan.

The objective facts in this case demonstrate that the Debtor and the Creditor have been, and continue to be, in litigation with one another and parties related to each entity. After a lengthy trial and much time and effort, the Creditor was awarded a large judgment against the Debtor in the state court litigation. The Debtor's Plan—for no justifiable reason—proposes only a 27% recovery on the Creditor's resulting unsecured claim, allowing the Debtor to keep all other value in the company after only 60 months of payments. The Creditor voted to reject the Debtor's Plan and that proposed treatment. The Creditor has ample justification based on just those facts in the record to reject the Debtor's Plan.[62]

A fundamental right of a creditor in a chapter 11 case is a vote on the proposed reorganization plan. A creditor does not have to forego self interest in voting on the plan. As the Ninth Circuit explained, "[i]f a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. On the other hand, pure malice, 'strikes'

---

[62] As the U.S. District Court for Maryland aptly explained,

Nonetheless, even assuming that Prudential acted with the motive the debtor ascribes to it, it is by now well settled that a creditor does not act in bad faith simply by pursuing its own self-interest. E.g., *Federal Support, supra,* 859 F.2d 17, 20; *In re SPM Manufacturing,* 984 F.2d 1305, 1317–1318 (1st Cir.1993); *In re Frank Fehr Brewing Co.,* 268 F.2d 170, 180 (6th Cir.1959) Further, evidence that a creditor "never intended to cooperate with [a debtor] and considered liquidation to be the only solution" does not establish a lack of good faith. *Hanson v. First Bank of South Dakota,* 828 F.2d 1310, 1315 (8th Cir.1987). Similarly, the fact that Prudential purchased and voted the claims of smaller creditors for the purpose of preventing confirmation of the debtor's plan does not demonstrate a lack of good faith. *In re 255 Park Plaza,* 100 F.3d 1214, 1219 (6th Cir.1996); see *In re Figter Limited,* 118 F.3d 635, 639 (9th Cir.1997). It is quite possible that Prudential believed that the liquidation of the debtor's estate was the most effective way to maximize the amount recovered from the defaulted loan. The fact that Prudential may have began with a different point of view before changing its mind does not lead to the conclusion that it possessed some unseen motive in pursuing its new course. The debtor points to no evidence that suggests that Prudential was motivated by anything but self-interest. Further, there is no showing that Prudential sought any more than it was entitled as a bona fide creditor. On this record, the Court concludes that Prudential offered its amended plan, and voted against the debtors plan, in good faith. The like determination of the Bankruptcy Court is affirmed.

*In re Three Flint Hill Ltd. P'ship*, 213 B.R. 292, 301 (D. Md. 1997).

and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior." *Id*. at 638 (citing *In re Pine Hill Collieries Co.*, 46 F. Supp. 669, 671 (E.D. Pa. 1942)). Even a creditor who purchases the Debtor's prepetition debt before or during the case, is a competitor, or may not want a debtor to succeed, is allowed to vote on a debtor's plan and to have that vote counted in the tally.[63] In the few cases where courts have designated a creditor's vote, the creditor typically has purchased claims against the debtor specifically to influence or block the debtor's reorganization efforts.[64]

That is not the case before the Court. The Creditor did not strategically buy claims to try to control the Debtor's reorganization. *Rather, the Creditor's claim pre-existed the Debtor's chapter 11 case and is a direct obligation between the Debtor and the Creditor that must be properly addressed through this case.* The Debtor offered no credible evidence that the Creditor voted against the Debtor's Plan to destroy value or impede the Debtor's reorganization. The animosity between the principals of the Debtor and the Creditor might make it difficult for the Creditor to support the Debtor's reorganization, but a creditor has no obligation to support, like, or root for a chapter 11 debtor. The Creditor's refusal to support a plan, its efforts to get information

---

[63] *See, e.g.*, *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 WL 6576416, at * 3 (Bankr. E.D.N.C. Dec. 17, 2012) ("Purchasing claims 'for the purpose of securing the approval or rejection of a plan does not of itself amount to "bad faith."'" *DBSD North America, Inc.*, 634 F.3d at 102 (citing *In re P–R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.1945); *In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d 1214, 1219 (6th Cir.1996)). Mere selfishness or protecting one's own self interest does not give rise to bad faith. *Id*. at 102. Section 1126(e) applies to creditors who are attempting to obtain a benefit to which they are not entitled. *Id*. (citing *In re Figter*, 118 F.3d 635, 638 (9th Cir.1997)).").

[64] *See, e.g.*, *In re Allegheny International, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) (designating the vote of a creditor who purchased just enough claims to block the plan of reorganization for 80–95% of the face amounts of the claims); *DISH Network Corp. v. DBSD North America, Inc. (In re DBSD North America, Inc.)*, 634 F.3d 79, 104–05 (2d Cir. 2011) (designating the vote of creditor where creditor had "purchased claims as votes it could use as levers to bend the bankruptcy process toward its own strategic objective of acquiring [debtor]'s spectrum rights, not protecting its claim."); *In re S.P.M. Mfg. Corp.*, 984 F.2d 1305, 1314 (1st Cir. 1993) (noting that "the purchasing of claims by an affiliate or insider of the debtor for the sole purpose of blocking the confirmation of competing plans may constitute 'bad faith' for the purposes of section 1126(e)"); *In re Adelphia Communs. Corp.*, 359 B.R. 54, 60–61 (Bankr. S.D.N.Y. 2006) (collecting cases on what types of conduct can constitute "bad faith" for purposes of vote designation).

33

from the Debtor, and its demand that it receive an optimal recovery under the plan do not indicate bad faith for voting purposes.

Notably, this is not an instance where the proposed plan otherwise clearly satisfies section 1129 of the Code, and the creditor's rejection of the plan is pure malice, ill will, or bad faith. If the Debtor's Plan proposed adequate new value to overcome the absolute priority rule of section 1129(b), the Creditor's rejection of the Debtor's Plan loses much of its significance.[65] The Debtor should not, however, be able to avoid making appropriate distributions under the facts of this case. "Merely protecting a claim to its fullest extent cannot be evidence of bad faith. There must be some evidence beyond negative impact on other creditors." *In re Fagerdala USA-Lompoc, Inc.*, 891 F.3d 848, 856–57 (9th Cir. 2018).

### 3.    Claim Classification

The Creditor argues that the Debtor's plan improperly classifies the Creditor's claim in a separate class from other unsecured creditors. The Debtor's Plan includes two classes of unsecured creditors: one for general unsecured creditors (trade and miscellaneous creditors) (Class 4), and one for the Creditor's judgment claim (Class 5). The Court's Preliminary Order suggested that such a classification scheme is not prohibited per se and may be acceptable based on the particular facts of the given case.[66] Given the Court's conclusion that the Debtor has not satisfied the absolute

---

[65] The Court acknowledges that the Creditor raised other objections to the Debtor's Plan that would require consideration but is focused here solely on the barrier posed by the absolute priority rule.

[66] In the Preliminary Order, the Court observed that several factors might support separate classification of the Creditor's claim. Considering the Preliminary Order and the record of the Confirmation Hearing, these factors could include the familial relationship between the owners of the Debtor and the Creditor, the ongoing litigation between these parties (such as the ongoing litigation over the family trust), the Creditor's ongoing litigation against current and former employees of the Debtor, the status of the Creditor as a competitor of the Debtor, and the amount and nature of the prepetition state court judgment. Moreover, the owners of the Creditor appear to be insiders of the Debtor under section 101(31)(B)(vi) of the Code. The Court notes, however, that the Principal's testimony also indicates that there is one other judgment creditor and one other competitor in the general unsecured class under the Debtor's Plan. Nevertheless, the Court makes no findings or conclusions of law on this particular legal issue, as it is not necessary to the Court's ruling in this Memorandum Opinion and the related Order.

priority rule of section 1129(b), the Court need not reach a final determination on the classification issue.

### B.      The Creditor's Plan

The Creditor's Plan arguably offers more value for creditors in this case, but it suffers from certain fatal flaws. In addition to lacking any meaningful support from other creditors, the Creditor has not provided adequate information concerning the ongoing operations of the Debtor as required by section 1129(a)(5) of the Code or shown that the Creditor's Plan is feasible under section 1129(a)(11) of the Code.

Section 1129(a)(5) of the Code requires that a plan provide information concerning the reorganized debtor's management team and compensation structure.[67] These disclosures allow creditors and the Court to assess the proposed reorganization of the debtor under the plan, the plan's implementation, and the plan's potential for success.[68] These factors also relate to the feasibility of the plan, which is a separate requirement discussed below.

---

[67] Section 1129(a)(5) of the Code provides,
    (5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
    (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
    (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.
11 U.S.C. § 1129.
[68] For example, the following represents the kinds of finding and evidence adequate to satisfy section 1129(a)(5) of the Code:
    AA. *Directors and Officers (11 U.S.C. § 1129(a)(5)(A)).* The Debtor has complied with section 1129(a)(5)(A) of the Bankruptcy Code and has disclosed the proposed initial officers of the Reorganized Debtor. The Debtor has disclosed in the Plan and Disclosure Statement the manner for selection of the Reorganized Debtor's officers and directors. The identities of the Debtor's officers and directors were disclosed in the Plan and Disclosure Statement. Upon review of the information provided by the Debtor pursuant to the Plan, Disclosure Statement and Exhibits to the Plan and the evidence presented at or prior to the Confirmation Hearing regarding the composition of the board of directors of the Reorganized Debtor and selection and appointment of the Reorganized Debtor's officers and directors is consistent with the interests of creditors and with public policy.
    BB. *Insiders (11 U.S.C. § 1129(a)(5)(B)).* The Plan discloses the identity of, and compensation received by each of the Debtor's officers and directors. Accordingly, because the Debtor has disclosed the nature of

35

The Creditor has stated options for the postconfirmation management team of the Debtor,[69] but there is no definite structure proposed or any plausible strategy to address potential employee and customer retention issues and other operational challenges that a reorganized Debtor under the Creditor's Plan might encounter.[70] The Creditor's counsel tried to mitigate these and related feasibility concerns by arguing that, even if the Creditor cannot continue the business, the Creditor's Plan would pay more value to the Debtor's creditors immediately upon confirmation through the Creditor's $250,000.00 contribution than the Debtor's Plan. That possibility does not, however, speak to the *reorganization* of the Debtor or necessarily satisfy each of the confirmation requirements set forth in section 1129(a).[71]

The feasibility component of plan confirmation is a litmus test for the plan's potential success. It often considers the plan proponent's proposed means for implementing the plan and the likelihood of those materializing. Specifically, section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

Courts generally hold that the feasibility requirement of section 1129(a)(11) "does not require that the debtor's plan is guaranteed to be successful, but must merely 'present a workable

---

compensation to be paid to its insider officers and directors, the requirements of section 1129(a)(5)(B) of the Bankruptcy Code have been met.
*In re Nat'l Heritage Found., Inc.*, No. 09-10525 (SSM), 2009 WL 8189290, at *6 (Bankr. E.D. Va. Mar. 11, 2009).

[69] *See, e.g.*, Tr. 3, ECF 594, at pp. 87, 93–97.

[70] For example, the Creditor's amended disclosure statement, with respect to management issues, states only that: "Vincent Jr. owns 100% of the membership interests in the Debtor. Vincent Jr. managed the Debtor before and during the Chapter 11 Case. As set forth in this Disclosure Statement and the Plan, Cantwell-Cleary will purchase 100% of the Equity Interests in the Reorganized Debtor, and will operate and manage the operations of the Reorganized Debtor." ECF 517.

[71] As has been noted by numerous courts, the central purpose of a chapter 11 case is to facilitate reorganization, not liquidation. *See, e.g.*, *Florida Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 333, n. 2 (2008); *In re Landmark Land Co. of Oklahoma, Inc.*, 973 F.2d 283, 288 (4th Cir. 1992) (noting that "the purpose of Chapter 11 is reorganization[.]"); *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984).

36

scheme of organization and operation from which there may be a reasonable expectation of success.'" *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 482–483 (Bankr. D.S.C. 2010) (quoting *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994)). For purposes of this analysis, courts can assess "'whether the things which are to be done after confirmation can be done as a practical matter under the facts.'" *Id*. at 483 (citations omitted).

Here, the Creditor's Plan is premised, at least in part, on the continued operation of the Debtor's business for at least nine years at a level sufficient to fund the stated distributions to creditors. As Mr. William Cleary noted (and as discussed above), the Creditor is uncertain regarding the management of the reorganized Debtor under the Creditor's Plan, whether the Debtor's employees would remain with the reorganized Debtor, or whether customers would remain with the reorganized Debtor. Mr. William Cleary stated what he hopes would happen to allow the Debtor's business to continue under the Creditor's Plan, but the Court has no evidence of the details of that strategy or the likelihood of its success. The Creditor has not met its burden under section 1129(a)(11) of the Code, and that failure alone requires the Court to deny confirmation of the Creditor's Plan.

**VIII.    Conclusion**

The Court appreciates the time and effort that the parties devoted to the plan solicitation and confirmation process. The Court is also mindful of the cost to the Debtor, the estate, and all creditors of ongoing litigation and uncertainty. The formulation and proposal of a confirmable chapter 11 plan alleviates those burdens and facilitates timely distributions of value to creditors. The Court cannot, however, ignore the requirements of the Code in favor of efficiencies or cost-savings. Neither plan proponent met its burden of proof under section 1129 of the Code. The

Debtor likewise failed to carry its burden under section 1126(e) in the context of the Designation Motion.

Accordingly, the Court will deny confirmation of the Debtor's Plan and the Creditor's Plan and deny the relief requested by the Designation Motion. The Court will enter a separate order consistent with this Memorandum Opinion.

**Copies to:**
**All Parties**
**All Creditors**
**U.S. Trustee**

**END OF MEMORANDUM OPINION**